1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PROTECT OUR COMMUNITIES FOUNDATION, BACKCOUNTRY AGAINST DUMPS and DONNA TISDALE,<br><br>                    Plaintiffs,<br><br>    vs.<br><br><br>KEN SALAZAR, in his official capacity as Secretary of the United States Department of the Interior; ROBERT ABBEY, in his official capacity as Director of the United States Bureau of Land Management; MARGARET L. GOODRO, in her official capacity as El Centro Field Office Manager for the United States Bureau of Land Management; UNITED STATES BUREAU OF LAND MANAGEMENT, a federal agency; and UNITED STATES DEPARTMENT OF THE INTERIOR, a federal agency,<br><br>                    Defendants,<br><br>OCOTILLO EXPRESS LLC,<br><br>Defendant-Intervenor.<br><br>                    Defendant. | CASE NO. 12cv2211-GPC(PCL)<br><br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS AND OCOTILLO'S MOTIONS FOR SUMMARY JUDGMENT**<br><br>[Dkt. Nos. 25, 28, 29.] |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs The Protect Our Communities Foundation; Backcountry Against Dumps; and Donna Tisdale filed a complaint challenging the United States Department of the Interior's approval of the May 11, 2012 Record of Decision ("ROD") approving the Ocotillo Wind Energy Facility Project ("OWEF" or "Project"), a utility-scale wind power project in the Sonoran Desert in Imperial County, California.  The complaint alleges Defendants violated the National Environmental Policy Act ("NEPA");  the Federal Land Policy and Management Act ("FLPMA"); and the Migratory Bird Treaty Act ("MBTA") and seeks relief under the Administrative Procedures Act ("APA").

## Procedural Background

On September 11, 2012, Plaintiffs filed a complaint for declaratory and injunctive relief against Defendants United States Department of the Interior ("Interior"); United States Bureau of Land Management ("BLM"); Ken Salazar, Secretary of the Interior; Robert Abbey, Director, U.S. Bureau of Land Management; and Margaret L. Goodro, Field Manager, BLM El Centro Field Office (collectively referred to as "Federal Defendants"). (Dkt. No. 1.) On October 4, 2012, the case was transferred to the undersigned judge. (Dkt. No. 10.) On October 22, 2012, the Court granted the joint motion for permissive intervention of Defendant-Intervenor Ocotillo Express, LLC ("Ocotillo"). (Dkt. No. 13.)

On December 11, 2012, January 23, 2013, and May 20, 2013, the administrative record was lodged with the Court. (Dkt. Nos. 20, 21, 24.) On June 17, 2013, Plaintiffs filed a motion for summary judgment.  (Dkt. No. 25.)  On July 17, 2013, Federal Defendants and Ocotillo filed their cross motions for summary judgment.  (Dkt. Nos. 28, 30.)  On August 16, 2013, Plaintiffs filed their oppositions.  (Dkt. Nos. 37, 38.) Federal Defendants and Ocotillo filed their replies on September 6, 2013.  (Dkt. Nos. 39, 40.)

## Factual Background

On December 19, 1980, the Department of the Interior approved a Record of Decision ("ROD") for the California Desert Conservation Area ("CDCA") which

[12cv2211-GPC(PCL)]

established a "long-range, comprehensive plan for the management, use, development, and protection of over 12 million acres of public land . . . ."  (OWEF[1] 5914.)  On October 9, 2009, Ocotillo applied to the Bureau of Land Management ("BLM") and to the County of Imperial to construct and operate a wind energy facility on public land within the CDCA.  (OWEF 5261.)  In February 2012, Interior created a Proposed Plan Amendment & Final Environmental Impact Statement/Final Environmental Impact Report ("Final EIS" or "FEIS/FEIR") for the Ocotillo Wind Energy Facility analyzing the impact of a 12,484 acre right-of-way ("ROW") over public land in favor of Ocotillo to build 155 wind turbine generators.  (OWEF 804, 825.)  On May 11, 2012, Interior approved an ROD for the Ocotillo Wind Energy Facility and Amendment to the California Desert Conservation Area Plan which approves a 10,151 acre right-of-way over public land in favor of Ocotillo to build 112 wind turbine generators.  (OWEF 109.)

**A.    Standard of Review**

The Administrative Procedures Act ("APA") governs judicial review of agency actions under FLPMA, and NEPA.  See 5 U.S.C. § 706; see also Oregon Natural Res. Council Fund v. Brong, 492 F.3d 1120, 1124 (9th Cir. 2007) (FLPMA and NEPA); Audubon Soc. of Portland v. U.S. Fish and Wildlife Serv., No. 04-670-KI, 2005 WL 1713086, at *4 (D. Or. July 21, 2005) ("MBTA").  An agency's decision must be upheld under judicial review unless the court finds that the decision or action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Actions that are approved "without observance of procedure required by law" are also subject to be set aside upon judicial review.  5 U.S.C. § 706(2)(D).

"An agency decision is arbitrary and capricious if, among other things, it 'offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency

---

[1]OWEF refers to the Administrative Record filed with the Court.

expertise.'" <u>Native Ecosystems Council v. Weldon</u>, 697 F.3d 1043, 1053 (9th Cir. 2012) (citation omitted).  The standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." <u>Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv.</u>, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).   Agency action is valid if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." <u>Arrington v. Daniels</u>, 516 F.3d 1106, 1112 (9th Cir. 2008) (citations omitted); <u>see also</u> <u>Nat'l Wildlife Fed v. U.S. Army</u>, 384 F.3d 1163, 1170 (9th Cir. 2004) (an agency must present a "rational connection between the facts found and the conclusions made.").  The burden is on Plaintiff to show any decision or action was arbitrary and capricious.  <u>See</u> <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 412 (1976).

**B.      National Environmental Protection Act ("NEPA")**

The NEPA requires agencies considering "major Federal actions significantly affecting the quality of the human environment" to prepare and issue an environmental impact statement ("EIS"). <u>Brong</u>, 492 F.3d at 1132 (citing 42 U.S.C. § 4332(C)).  The statement must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. The Court's role is to ensure that the agency took a "hard look" at the potential environmental consequences of the proposed project. <u>Brong</u>, 492 F.3d at 1132 (citation omitted).  "We review an EIS under a rule of reason to determine whether it contains a 'reasonably thorough discussion of probable environmental consequences.'" <u>Selkirk Conserv. Alliance v. Forsgren</u>, 336 F.3d 944, 958 (9th Cir. 2003).  The court does not substitute its judgment for that of the agency. <u>Id.</u> The NEPA does not contain substantive environmental standards, nor does the Act mandate that agencies achieve particular substantive environmental results.  <u>Ctr. for Biological Diversity v. U.S. Forest Serv.</u>, 349 F.3d 1157, 1166 (9th Cir. 2003).

[12cv2211-GPC(PCL)]

**1.      Purpose and Need and Reasonable Range of Alternatives**

Plaintiffs argue that the BLM's purpose and need statement is contrary to law because it adopted the applicant's goal as its own, and as a result, restricted BLM's consideration of alternatives.  Federal Defendants and Ocotillo argue that BLM's purpose and need statement complies with NEPA and it considered reasonable range of alternatives.

An EIS must discuss "reasonable alternatives" to the proposed project.  42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14 (consideration of alternatives "is the heart of the environmental impact statement.")  The "rule of reason" applies to the choice of alternatives as well as the extent to which the EIS must discuss each alternative. Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195 (D.C. Cir. 1991) (quoting State of Alaska v. Andrus, 580 F.2d 465, 475 (D.C. Cir. 1978)). The environmental impact statement need not consider an infinite range of alternatives, only reasonable or feasible ones. 40 C.F.R. § 1502.14(a)-(c).  "The agency must look at every reasonable alternative within the range dictated by the nature and scope of the proposal." Friends of Se's Future v. Morrison, 153 F.3d 1059, 1065 (9th Cir. 1998); see also Idaho Conserv. League v. Mumma, 956 F.2d 1508, 1520 (9th Cir. 1992). The "existence of a viable but unexamined alternatives renders an environmental impact statement inadequate." Alaska Wilderness Recreation & Tourism Ass'n v. Morrison, 67 F.3d 723, 729 (9th Cir. 1995).  As for alternatives which were eliminated from detailed study, the agency must briefly discuss the reason for their exclusion.  40 C.F.R. § 1502.14(a).

40 C.F.R. § 1502.13 requires that the EIS "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."  40 C.F. R. § 1502.13.  The purpose and need of a project dictates the range of "reasonable" alternatives. City of Carmel-by-the-Sea v. U.S. Dep't. of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997).  While agencies are afforded discretion to define the purpose of a project, an agency cannot define its

objective in reasonably narrow terms in order to avoid the requirement that relevant alternatives be considered. <u>Friends of Se's Future</u>, 153 F.3d at 1066.  An agency's statement of purpose is reviewed under a reasonableness standard. <u>NPCA v. BLM</u>, 606 F.3d 1058, 1070 (9th Cir. 2010).  In determining its purpose and need statement, the agency must consider the statutory context of the proposed action and the applicant's private objectives. <u>Alaska Survival v. Surface Transp. Bd.</u>, 705 F.3d 1073, 1085 (9th Cir. 2013); <u>see also</u> <u>NPCA</u>, 606 F.3d at 1070.  Courts must consider "whether the purpose and need statement is reasonable in light of the [applicant's] goals and the statutory context." <u>Alaska Survival</u>, 705 F.3d at 1085.

Citing one sentence addressing the applicant's objectives out of a three paragraph purpose and need statement, Plaintiffs argue that the BLM adopted the Project applicant's statement of purpose and need and consequently constrained BLM's consideration of alternatives. (<u>See</u> OWEF 848.) The BLM contends that it formulated its own objectives and also considered the Applicant's goals and needs.  It asserts that the objectives are reasonable because they are fully consistent with Congressional and Secretarial mandates as outlined in Executive Order 13212, Energy Policy Act of 2005, and Secretarial Order 3285A1.  Moreover, it argues that the purpose and need statement is reasonable because it is consistent with the CDCA's Plan's goals and objectives which include the goal of "[i]dentify[ing] potential sites for geothermal development, wind energy parks, and powerplants." (OWED 6000.) Ocotillo contends that the purpose and need statement represents the goals of Congress, the President and the Secretary of the Interior to promote renewable energy projects on federal lands to which the Project is a partial response.

The relevant portions of the BLM's Purpose and Need provision states:

> Taking into account the BLM's multiple use mandate, the purpose and need for the Proposed Action is to respond to a FLPMA ROW application submitted by the Applicant to construct, operate, maintain, and decommission a wind energy-generating facility and associated infrastructure on public lands administered by the BLM in compliance with FLPMA, BLM ROW regulations, and other applicable Federal laws and policies.

[12cv2211-GPC(PCL)]

The proposed action would, if approved, assist the BLM in addressing the following management objectives:

• Executive Order 13212, dated May 18, 2001, which mandates that agencies act expediently and in a manner consistent with applicable laws to increase the "production and transmission of energy in a safe and environmentally sound manner."

• The Energy Policy Act 2005 (EPAct 05), which sets forth the "sense of Congress" that the Secretary of the Interior should seek to have approved non-hydropower renewable energy projects on the public lands with a generation capacity of at least 10,000 MW by 2015.

• Secretarial Order 3285A1, dated March 11, 2009, and amended on February 22, 2010, which "establishes the development of renewable energy as a priority for the Department of the Interior."

This proposed action, if approved, would also further the development of environmentally responsible renewable energy as a priority for the Department of the Interior.

(OWEF 848.)

Plaintiffs rely on the NPCA case where the Ninth Circuit held that the purpose and need statement was impermissibly narrow and which necessarily and unreasonably limited the range of alternatives. NPCA, 606 F.3d at 1072. In that case, the BLM did not dispute that three out of four objectives were the applicant's objectives. Id. at 1071.

Contrary to Plaintiffs' assertions, the Court finds that the BLM did not simply adopt the applicant's goals and purpose. The "BLM Purpose and Need" section specifically explains how the applicant's proposed project would assist in the BLM's objective in carrying out Executive Order 13212, Energy Policy Act of 2005 and Secretarial Order 3285A1. (OWEF 848.) In addition, the EIS includes a provision entitled "BLM Purpose and Need" and a separate provision entitled the "Applicant's Objectives." (OWEF 848-49.) Plaintiffs' argument that the purpose and need statement only adopted the applicant's goal is not valid.

Based on the purpose and need statement, the Court considers the range of alternatives analyzed in the EIR/EIS.

As to the range of alternatives, the agency shall:

(a) Rigorously explore and objectively evaluate all reasonable

1
2

alternatives, and **for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated**.
(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

3

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

4

(d) Include the alternative of no action.

5

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

6
7

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

8
9

40 C.F.R. § 1502.14(a)-(f) (emphasis added).  The alternatives must be ascertainable

10

and reasonably within reach.  City of Angoon v. Hodel, 803 F.2d 1016, 1021-22 (9th

11

Cir. 1986).

12
13

Plaintiffs argue that the BLM did not consider any non-wind renewable energy

14

alternatives such as solar, geothermal, biomass, tidal, wave energy, distributed solar

15

generation, conservation and demand-side management alternatives.  (OWEF 910.)

16

Plaintiffs assert that the purpose and need statement was narrowly based on the

17

applicant's goal of building a wind energy facility and not based on BLM's broader

18

resource management goals of encouraging renewable energy development.    Thus,

19

these non-wind alternatives were not considered because the applicant wanted to build

20

a wind energy facility near Ocotillo.

21

Federal Defendants argue that the BLM did not consider non-wind renewable

22

energy alternatives because the alternatives were confined by the purpose and need

23

statement and limited the alternatives "to those that would actually respond to the

24

Applicant's request to develop a wind energy facility." (Dkt. No. 28-1 at 15.)  Ocotillo

25

argues that BLM considered eighteen potential alternatives, to include different size

26

wind energy projects, alternative sites for development and alternative types of energy

27

projects and were carefully evaluated for feasibility, consistency with BLM's purposes

28

and needs and environmental consequences.   (OWEF 1689.)    In the end, six

alternatives were developed for detailed analysis in the EIS. (OWEF 863, 864; 1689.)

[12cv2211-GPC(PCL)]

In the Final EIS/EIR, Table 2-7 demonstrates that the BLM considered these non-wind alternative types of energy and provided an explanation as to why they were eliminated from detailed analysis in the FEIS. (OWEF 910-12.) After all the different types of alternatives were carefully evaluated, six alternatives were determined to be reasonable and the EIS provides detailed analysis of these six alternatives which also included a No Project/Action Alternative. (OWEF 863, 864.) The Court concludes that the BLM did not unreasonably evaluate alternatives. While the national policy and objective are broad to include all types of renewable energy sources, the BLM must also consider the applicant's goals which is to establish a wind energy facility.

Plaintiffs further contend that the BLM's analysis was improperly limited to lands within Imperial County and it failed to consider project sites, on private or public lands, outside of Imperial County. Second, the FEIS failed to consider the feasibility of comparably sized projects that use other forms of renewable energy outside Imperial County. Federal Defendants argue that they considered alternative sites but eliminated them because they would not support the Project. Since it was a wind energy project, it was looking for an areas with high wind density. Within BLM administered land, the Project site is the only area with high wind density. (OWEF 908; 914.) Outside of BLM administered land, many potentially suitable sites are in use or are proposed for other wind energy projects. (OWEF 908.) Another site was considered but it did not have the high wind potential necessary for the project's objective and to keep environmental impacts to a minimum. (OWEF 908.) It also considered private lands but determined those lands did not have the necessary wind energy potential. (OWEF 907.) Lastly, it did not look outside Imperial County because it would not respond to the applicant's ROW application and would be inconsistent with the purpose and need statement. Even outside of Imperial County, there are limited areas that have enough wind energy potential to sustain the Project. (OWEF 1829-31; 19528.) Ocotillo asserts that the BLM considered alternative sites both on and off federal property. (OWEF 906-08.)

Plaintiffs do not explain why the BLM should have considered land outside of Imperial County and the feasibility of comparably sized projects that use other forms of renewable energy outside the County.  See City of Angoon, 803 F.2d at 1022 ("[t]hose who challenge an EIS bear a responsibility 'to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions.'").  Accordingly, the Court concludes that the EIS was adequate because it discussed  reasonable alternatives and did not violate NEPA.

### 2.    Environmental Impacts

#### a.    Inaudible Noise - Infrasound and Low Frequency Noise

Plaintiffs argue that the BLM violated NEPA by failing to take a "hard look" at the public health impacts of the Project's infrasound and low-frequency noise ("ILFN").[2]  They allege that ILFN causes significant health impacts such as insomnia, visceral vibratory vestibular disturbance, vertigo, headaches, dizziness, unsteadiness, tinnitus, ear pressure or pain, external auditory canal sensation, fatigue irritability, memory and concentration effects, loss of motion, cardiac arrhythmias, stress and hypertension among others. (OWEF 3963.) They allege that the BLM dismissed ILFN impacts and ignored all but two studies submitted in public comment.  BLM and Ocotillo dispute Plaintiffs' analysis and argue that the BLM did consider at length the impacts of inaudible noise and Plaintiffs merely disagree with the BLM's conclusion.

Courts must be "at [our] most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise." Lands Council v. McNair, 629 F.3d 1070, 1074 (9th Cir. 2010).  Courts are not to "act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty." Lands Council, 537 F.3d at 988 (internal quotation marks and brackets omitted). And "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own

---

[2]Plaintiffs describe, which is not opposed by Defendants, infrasound to include frequencies less than 20 hertz ("Hz"), which is below the normal range of human hearing.  Low-frequency sound ranges from 20Hz and 200 Hz.  (Dkt. No. 25 at 12.)

[12cv2211-GPC(PCL)]

1  qualified experts even if, as an original matter, a court might find contrary views more
2  persuasive."  Id. at 1000 (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360,
3  378 (1989)). "[W]here there is conflicting evidence in the record, the [agency's]
4  determination is due deference—especially in areas of [its] expertise." NPCA v. U.S.
5  Dept. of Transp., 222 F.3d 677, 682 (9th Cir. 2000); Managed Pharm. Care v. Sebelius,
6  716 F.3d 1234, 1251 (9th Cir. 2012).

7       Plaintiffs assert that their studies support the conclusion that there are adverse
8  health effects with ILFN caused by the wind turbines.  They cite to studies by Salt and
9  Hullar (2010)[3] and Richard James[4] and a study by Pierpont (2009)[5] that conclude that
10  infra and low frequency sound affects the body's vestibular response and causes health
11  problem.  Moreover, ILFN from wind turbines can cause extreme annoyance and
12  inability to sleep or disturbed sleep.  (OWEF 3978, 4332.)

13      On the other hand, the BLM cite to studies that conclude that inaudible noise
14  does not harm people.      In the Final EIS/EIR, the BLM acknowledges that there is a
15  "wind turbine health debate" where experts have argued that despite appropriate
16  audible noise setbacks, exposure to low frequency noise may cause health effects.
17  (OWEF 1602.)  However, there is "no consensus and very little data to evaluate the
18  exact effect of background noise on the audibility of infrasound." (OWEF 3428.)  The
19  BLM relies on Geoff Leventhall, Ph.D, an internationally recognized expert in noise
20  vibration and acoustics from the United Kingdom, who states that "broad band
21  infrasound and low frequency noise is not normally a disturbance for people." (OWEF
22  1692.)  Moreover, the BLM relied on a recent study published in 2011 by O'Neal et

23
24
25

26  [3](OWEF 3973: Alec N. Salt and Timothy E. Hullar, "Responses of the Ear to Low Frequency
Sounds, Infrasound and Wind Turbines," Elsevier, Hearing Research, 2010.)

27  [4](OWEF 3977: Jerry Punch, Richard James, and Dan Pabst, "Wind Turbine Noise: What
Audiologists Should Know," Audiology Today, July/August 2010.)
28

     [5]Dr. Nina Pierpont, Wind Turbine Syndrome: A Report on a Natural Experiment, 2009.

al.[6], which constitutes the first study that actually measured low frequency noise ("LFN") outside and inside nearby two homes at the Horse Hollow Wind Farm in Texas. (OWEF 1692; 55829.) Measurements were collected at the wind turbine, with the same model proposed for the Project. They determined that LFN and infrasound at both homes were less than any internationally recognized standards and criteria and concluded that no adverse public health effects from LFN or infrasound would be expected at distances greater than 300 m (984.25 feet). At the Project, the closest turbine to the nearest home is 804.67 m (2,640 feet). Therefore the FEIS concluded that the LFN and infrasound are unlikely to be health concerns. (OWEF 1692.)

The BLM also relied on the studies by Moller and Pederson (2009) which concluded that "infrasonic sound emissions from modern upwind-configured wind turbines are below audibility thresholds for even the more sensitive people at a distance of 1,000 feet." (OWEF 3428.) "The Project proponent is not stating that wind turbines do not produce infrasound; rather, that infrasound is not expected to be an issue at the proposed setback distances." (OWEF 3428.)

In another article by Knopper and Ollson (2011)[7], the authors concluded that "no peer reviewed scientific journal articles demonstrate a causal link between people living in proximity to modern wind turbines, the noise (audible, low frequency noise, or infrasound) they emit and resulting physiological health effects). (OWEF 55872.) In that article, they question the Salt and Hullar study asserting that their hypothesis that infrasound affects cells and structures at levels that cannot be heard was never tested and even Salt and Hullar assert the need for further research. (OWEF 55870.) They also reference and support the O'Neill study where he actually measured wind turbine noise inside and outside over the course of one week and concluded that there should be no adverse public health effects from infrasound or low frequency noise at

---

[6](OWEF 55810: Robert D. O'Neal, Robert D. Hellweg, Jr. And Richard M. Lampeter, Low Frequency Noise and Infrasound From Wind Turbines, Noise Control Eng. J., March-April 2011.)

[7](OWEF 55865: Loren D Knopper and Christopher A Ollson, Health Effects and Wind Turbines: A Review of the Literature, Environmental Health, 2011.)

[12cv2211-GPC(PCL)]

distances greater than 305 meters.  (OWEF 55870.)

The FEIS rejected the conclusions by Dr. Pierpont and Drs. Salt and Hullar that there are health effects from ILFN because they are merely hypotheses and made without supporting documentation of wind turbine low frequency noise measurements. These studies have never actually measured LFN or infrasound surrounding wind turbines.  (OWEF 1692.)  Furthermore, the FEIS explained that Dr. Pierpont in her book entitled Wind Turbine Syndrome: A Report on a Natural Experiment concerned a case series of interviewed with ten (10) families that claim to be experiencing health effects of living near turbines.  (OWEF 1693-94.)  She speculated that the symptoms were related to noise or infrasound but did not conduct any the measurements around the homes.  (OWEF 1694.)  It also rejected as unreliable commonly cited internet studies because none of these studies have been published in a credible peer-reviewed scientific journal that describes a dose-response relationship between noise, infrasound or any other emission from a turbine.  (OWEF 1694.)

Contrary to Plaintiffs' assertions, the final EIS discusses the impacts of non-audible and non-perceptible ILFN.  (OWEF 1349 (discussing Wind Turbine Syndrome as an illness that is potentially caused by wind turbine noise and vibration resulting in sleep disturbance, nausea, tinnitus, and other symptoms.); (OWEF 1013; 1692-1694; 19167-68.)  The EIS determined that "there is no known dose-response relationship between exposure to wind turbine noise/vibration and health effects." (OWEF 1013.) The BLM satisfied the requirements of NEPA by providing reasons why it did not adopt Plaintiffs' experts' opinions.  See 40 C.F.R. § 1502.14(a).

The BLM conducted an analysis of inaudible noise and based on the studies it found reliable, and based on its agency expert opinion, determined that the impacts from "inaudible" noise would be minimal.  Where there are conflicting expert opinion, it is not the Court's role to determine which scientific studies the BLM should adopt and the Court  must defer to the agency's determination.  See Nat'l Parks & Conserv. Ass'n, 222 F.3d at 682.  The Court's role is to determine whether the agency took a

"hard look" at the potential environmental consequences of the Project.  The BLM conducted a thorough analysis, reviewing studies and literature with differing views on the inaudible impacts of the Project.  Consequently, the BLM decision to rely on its expert conclusion was not arbitrary, capricious or an abuse of discretion."  <u>See</u> 5 U.S.C. § 706(2)(A).

### b.    Audible Noise Impacts

Plaintiffs also contend that the BLM conducted an inadequate analysis of audible noise impacts because it did not use the normalization factors the EPA Levels Documents to accurately assess the wind turbines' audible impacts in a rural setting. They assert that normalization increases the reported values by 15 dBA to nearly 65dBA in some cases.  (OWEF 4325.)  Federal Defendants argue that its decision to employ the County's General Plan Noise Element was its preferred methodology which is entitled to deference.  Ocotillo contends that the BLM took a "hard look" at noise impacts by considering the impact of noise, conducting detailed analysis and drafting mitigation measures to reduce such impact.

It is not the role of the court "to decide whether an [EIS] is based on the best scientific methodology available." <u>Alaska Survival</u>, 705 F.3d at 1088 (quoting <u>McNair</u>, 537 F.3d at 1003 (internal quotations omitted).  As long as the agency engages in a "reasonably thorough discussion," courts do not require unanimity of opinion among agencies." <u>Id.</u> (citing <u>City of Carmel–By–The–Sea v. U.S. Dept. of Transp.</u>, 123 F.3d 1142, 1151 (9th Cir. 1997).  "A disagreement among experts or in the methodologies employed is generally not sufficient to invalidate an EA . . . .  Courts are not in a position to decide the propriety of competing methodologies . . . .but instead, should determine simply whether the challenged method had a rational basis and took into consideration the relevant factors." <u>Comm. to Preserve Boomer Lake Park v. Dept. of Transp.</u>, 4 F.3d 1543,1553 (10th Cir. 1993).

Disagreeing with the methodology conducted by the agency does not constitute a NEPA violation. <u>Native Ecosystems Council</u>, 697 F.3d at1053 (court may not assert

its opinions in place of forest biologists).  The court is required to be "at its most deferential" when reviewing scientific judgements and technical analyses within the agency's expertise.  <u>Northern Plains Res. Council, Inc. v. Surface Transp. Bd.</u>, 668 F.3d 1067, 1075 (9th Cir. 2011) (court is not to "act as a panel of scientists that instructs [the agency] . . ., chooses among scientific studies . . ., and orders the agency to explain every possible scientific uncertainty . . . [w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").  "[A]gency must, at a minimum, support its conclusion with studies that the agency deems reliable."  <u>Id.</u>

In response to a comment suggesting the application of the normalization adjustment factors in the EPA Levels Document (1974), the BLM stated that "the noise levels estimated for the OWEF were analyzed to determine impacts based on the County's land use compatibility guidelines, property line noise limits, as well as construction noise standards." (OWEF 3423.)  While Plaintiffs would have preferred a methodology that assesses audible noise by normalizing noise estimates based on the EPA Levels Documents, the BLM decided to utilize the County's guidelines.  <u>See Sierra Club v. Tahoe Reg'l Planning Agency</u>, 916 F. Supp. 2d 1098, 1149 (E.D. Cal. 2013) (reasonable policy determination to use city's noise ordinance).

Besides stating that normalization increases the reported values by 15 dBA to nearly 65dBA in some cases, Plaintiffs does not explain why the County Plan would not be a sufficient methodology.

Second, Plaintiffs contend that the BLM underestimated the magnitude of the increase in ambient noise that the Project will cause because it failed to measure both daytime and nighttime ambient noise in the Project area.  Instead, the BLM limited its measurements to 20 minute sample at each of six locations taken during the daytime, between 9 a.m. - 4 p.m.  (OWEF 996).  However acoustical engineers state that it is very important to establish the long term background noise environment during the

1    quietest sleeping hours of the night between 10 p.m. and 4 a.m. because "nighttime

2    sleep disturbance has generated the majority of wind farm noise complaints throughout

3    the world." (OWEF 4381.)

4        The BLM acknowledges that while nighttime noise was not measured, it was

5    accounted for in the analysis.  The EIS recognizes that sensitivity to noise increases

6    during these times and added "artificial noise penalties." (OWEF 991.) A 5dB upward

7    adjustment was made for the hours from 7:00 p.m. and 10:00 p.m. and a 10dB upward

8    adjustment was made for the hours between 10:00 p.m. and 7:00 a.m.  (OWEF 991.)

9    The BLM reasonably estimated the magnitude of the increase in ambient noise.

10        Plaintiffs have not shown that the BLM did not adequately consider the

11    "audible" noise impacts of the Project.

12               **c.**      **Noise Mitigation - Setbacks**

13        Plaintiffs assert that the BLM refused to assess the efficacy of noise impact

14    mitigation measures concerning wind turbine setbacks and insufficiently concluded

15    that "level of project-related noise varies with the turbine model, turbine layout,

16    number of turbines, speed of the turbine blades, meteorological conditions, terrain, and

17    the distance of the listener from the turbine." (OWEF 3418.)  The BLM asserts that the

18    FEIS clearly states that no "mitigation is available to reduce this impact without

19    removal of wind turbines." (OWEF 1324.)  Ocotillo maintains that the BLM took a

20    "hard look" at the noise impacts and drafted mitigation measures to reduce such

21    impacts.

22        An EIS promulgated under NEPA must contain "a reasonably complete

23    discussion of possible mitigation measures."  Robertson v. Methow Valley Citizens

24    Council, 490 U.S. 332, 352 (1989).  40 C.F.R. § 1502.14 provides that BLM shall

25    include "appropriate mitigation measures not already included in the proposed action

26    or alternatives."  40 C.F.R. 1502.14(f).  An EIS must discuss the "[m]eans to mitigate

27    adverse environmental impacts (if not fully covered under 1502.14(f))."  40 C.F.R. §

28    1502.16(h). NEPA requires a discussion of "all practicable means to avoid or minimize

environmental harms" 40 C.F.R. § 1505.2(c).  NEPA does not require that harms actually be mitigated but does require that an EIS discuss mitigation measures with "sufficient detail to ensure that environmental consequences have been fairly evaluated."  South Fork Band Council of W. Shoshone of Nev. v. U.S. Dept. of Interior, 588 F.3d 718, 727 (9th Cir. 2009).

Plaintiffs assert that experts have recommended a setback of 1.25 miles for residences from large wind projects and dozens of residents live within that range. (OWEF 3966-67; 4319.)  Federal Defendants argue that these experts did not specifically assess the Ocotillo Wind Project.  Moreover, the BLM's scientific research revealed that setbacks would not be helpful.  (OWEF 55976) ("While the primary purpose of this study was to evaluate the potential for adverse health effects rather than develop public policy, the panel does not find that setbacks of 1 mile are warranted."); (OWEF 55873) ("In terms of wind power, ethics dictate an honest reporting of the issues surrounding annoyance and the fact that it appears that a limited number of people have self-reported health effects that may be attributed to the indirect effects of visual and attitudinal cue. We believe that any physiological based effect can be mitigated through the use of appropriate setback distances. However, it is not clear that for this hypersensitive annoyed population that any set back distance could mitigate the indirect effects.").

Here, contrary to the statement cited by Plaintiffs,[8] the BLM determined that while there may be impacts, no mitigation was available to reduce the impact without removal of wind turbines.  (OWEF 1324.)  The BLM explains that it analyzed noise impact under the worst case scenario.  The analysis looked at the worst case scenario using Siemens 2.3 MW turbines for all 158 turbines, operating at full load and

---

[8] Plaintiffs' reference to the BLM's comment that the level of project related noise varies is in response to comments from Richard James asserting that turbine setbacks less then 1.25 miles are inadequate which BLM disputes because turbine setback distance does not guarantee a particular noise level at property lines and would depend on turbine model, layout, number of turbines, the speed of turbines, terrain, etc. (OWEF 3418.)

operating 24 hours per day.  (OWEF 1303.)  Under this worst case scenario, only "some residences would experience noise levels slightly above 40dBA Leq[9] when temperatures are low and relative humidity is high." (OWEF 1303.)   This type of scenario would occur less than 1 percent of the year. (OWEF 3421.)  When weather conditions are less severe, none of the homes in the northern and southern town centers would experience noise levels above 40dBA Leq.  The worst case scenario noise impacts are also below Imperial County's most stringent noise limits applicable to residential areas.  (OWEF 1304) ("Imperial County General Plan Noise Element specified noise level limits at property line of residential areas of 50dBA Leq (1-hour) daytime and 45 dBA Leq (1-hour) nighttime.")

The BLM concluded that these noise levels may result in complaints from local residences resulting in an unavoidable adverse impact and removal of the wind turbines was not practical.  Therefore, no mitigation is available to reduce this impact without removal of wind turbines. (OWEF 1324.)  Moreover, the BLM notes that while no setbacks are required, the Applicant noted that these setback distances are greater than the setback requirements in other wind siting projects in North America.  (OWEF 3533) (the Province of Ontario requires setbacks of 550 meters while in Ocotillo the nearest turbine to any home is over 790 meters).

As discussed above, the Court must defer to the evaluation of agencies which has discretion to rely on reasonable opinions of its own experts  when there are conflicting views.  See Marsh, 490 U.S. at 378.  Accordingly, Plaintiffs' allegation that the BLM refused to address the efficacy of noise impact mitigation measures is without merit.

**2.     Visual Impacts**

Plaintiffs assert that BLM's visual impact analysis was deficient because it only looked at the impact of the turbines and did not address the visual impacts of the Project's buildings, observation tower, parking lot, roads and traffic.  The BLM

---

[9]Leq, equivalent sound level, "is a single value for any desired duration which includes all the time-varying sound energy in the measurement period, usually one hour."  (OWEF 991.)

[12cv2211-GPC(PCL)]

1  contends that it adequately analyzed visual impacts of the Project as a whole and the

2  fact that the analysis focused on the wind turbines is consistent with NEPA as that is

3  the most prominent feature of the Project. Ocotillo asserts that the BLM took a "hard

4  look" at the visual impacts and removed, and also moved some turbines to address

5  visual impacts and implemented mitigation measures to minimize any impacts.

6      An EIS "shall provide full and fair discussion of significant environmental

7  impacts and shall inform decisionmakers and the public of the reasonable alternatives

8  which would avoid or minimize adverse impacts or enhance the quality of the human

9  environment." 40 C.F.R. § 1502.1. "Agencies shall focus on significant environmental

10  issues and alternatives and shall reduce paperwork and the accumulation of extraneous

11  background data." Id. "Impacts shall be discussed in proportion to their significance.

12  There shall be only a brief discussion of other than significant issues. As in a finding

13  of no significant impact, there should be only enough discussion to show why more

14  study is not warranted." 40 C.F.R. § 1502.2(b).

15      Here, the wind turbines are the most significant structures that will alter the

16  scenic landscape. The BLM conducted an analysis of visual resources of the Project

17  as a whole while focusing on the visual impacts of the wind turbines. (OWEF 1483-

18  1502.) The non-turbine facilities, roads, observation tower are insignificant compared

19  to the significant impact of the wind turbines. Therefore, it was appropriate for the

20  BLM to spend less time analyzing these non-turbine structures in its EIS. (See OWEF

21  1484.)

22      Plaintiffs also argue that there is a direct conflict between the FEIS's description

23  of the Project as a VRM IV compared with the technical appendices' designation of the

24  Project site as VRM Class II and III viewshed, (OWEF 2443). This conflict violates

25  NEPA because it precludes informed review by the agency and the public. The BLM

26  and Ocotillo contend that Plaintiffs are confused and conflate the two steps of the

27  BLM's visual resource evaluation and management process. They explain that the

28  BLM evaluated visual impacts using VRI Class II and Class III as baselines and then

[12cv2211-GPC(PCL)]

through the NEPA analysis, determined that the Project can only conform to an interim VRM Class IV objectives.  In its reply, the BLM admits that the Appendix erroneously references the baseline as "VRM" and not "VRI."  See Pac. Coast Fed. of Fishermen's Ass. v. U.S. Bureau of Reclamation, 426 F.3d 1082, 1090 (9th Cir. 2005) (citation omitted) ("Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'").

The Court previously explained in related cases[10] that "[a]s to the first step, the BLM conducted an inventory of the project area and designated sites as either VRI Class II or VRI Class III.  (OWEF 1088-1092; 2443.)  As to the second step in establishing an interim VRM class designation, in the Final EIS, the BLM determined that the Project would be a VRM Class IV designation."  (OWEF 1483-84.)  Accordingly, the BLM adequately analyzed visual impacts and did not violate NEPA.

### 3.    Peninsular Bighorn Sheep

Plaintiffs argue that the FEIS fails to fill in essential data gaps regarding the impacts of the Project on the Peninsular Bighorn Sheep ("PBS") since the BLM acknowledged that it is not known how the PBS would respond to the wind turbines. They also argue that future mitigation measures cannot replace the BLM's failure to analyze the impact of the Project on the PBS.  Federal Defendants contend that despite the low level of use by the PBS on the Project site, the BLM adequately analyzed the impacts to PBS through mitigation plans such as the Habitat Restoration Plan and a Bighorn Sheep Mitigation and Monitoring Plan ("MMP").  Ocotillo contends that despite the fact that PBS does not occupy any area where the Project is proposed, the Fish and Wildlife Service ("FWS") addressed the impacts on PBS by the Project and numerous mitigation measures were adopted.

The FEIS states the "[n]o OWEF project components are proposed for

---

[10] Desert Protective Council v. U.S. Dept. of Interior, 927 F. Supp. 2d 949 (S.D. Cal. 2013); and Quechan Tribe of the Fort Yuma Indian Reserv. v. U.S. Dept. of the Interior, 927 F. Supp. 2d 921 (S.D. Cal. 2013)

1  construction on land currently occupied by the PBS."  (OWEF 1587; OWEF 157

2  ("Because no critical habitat for either species (PBS and Least Bell's Vireo) has been

3  designated within the action area, no critical habitat would be adversely affected."))

4  FEIS states "Designated Critical Habitat for the PBS does not occur on the proposed

5  OWEF site."  (OWEF 1150.) The PBS has been cited and only occupy the I-8 island

6  in the southwest portion of Site 1.  (OWEF 1150-51.)  The FEIS concluded that the

7  Project would not cause direct impacts to PBS designated critical habitat, occupied

8  habitat in the I-8 Island or any PBS watering holes or guzzlers.  (OWEF 1588.)

9        However, the FEIS acknowledged that "[t]he potential direct effects of the

10  proposed OWEF include impacts to USFWS Essential Habitat, mortality of PBS as a

11  result of collision with construction equipment, elimination of access to foraging areas,

12  disruption of reproduction or lambing activities, prevention of dispersal or

13  intermountain movements."  (OWEF 1588.)

14        Despite the lack of direct impact on the PBS' critical habitat, the FWS conducted

15  a detailed and formal Endangered Species Act Section 7 consultation of the impacts on

16  PBS on the project.  (OWEF 157-221.)  As a result, numerous mitigation measures

17  were adopted including the Bighorn Sheep Mitigation and Monitoring Plan and a

18  1,000-foot buffer if PBS are observed on site.  (OWEF 1588.)

19        BLM admits that it "is not known how PBS would respond when the WTG

20  blades are operating because behavioral studies in response to wind development sites

21  have not been conducted, and no published studies of PBS use of wind energy projects

22  sites are available."  (OWEF 1602.)  Plaintiffs assert that the BLM had the duty to fill

23  the gap by independent research.  Instead, since there are no published studies of the

24  effects of wind turbines on PBS, the EIS determined that construction activities could

25  have a significant indirect impact and it was reasonable for the BLM to require

26  mitigation to minimize those potential impacts.

27        In Okanogan Highlands Alliance, the Ninth Circuit held that while the actual

28  adverse effects of the water quality were uncertain and the EIS considered extensively

the potential effects and mitigation processes, the discussion of mitigation measures in the EIS was adequate.  Okanogan Highlands Alliance v. Williams, 236 F.3d 468, 477 (9th Cir. 2000) (FWS explained in the draft EIS that "[s]ince it is not possible to predict exactly what water quality will be, it is difficult to predict what exact mitigation will be necessary. We have set up . . . a procedure to determine specific mitigation or treatment, if any, is required. Moreover, a performance security which assumes treatment of the pit discharge water is necessary, will be collected prior to development.")  Plaintiffs citation to Fdn. for American Wild Sheep v. U.S. Dept. of Agriculture, 681 F.2d 1172, 1178-79 (9th Cir. 1982) is not supportive as this case challenged the Forest Service's failure to prepare an EIS based on a faulty EA prior to granting a special use permit allowing the reconstruction and use of a road.

Consequently, despite the unknown effect of the Project on the PBS, it was not unreasonable for the BLM to develop mitigation plans to avoid any potential impacts on the PBS.

Plaintiffs also argue that the two studies the BLM relied on to reach its conclusion are distinct from this case as the first evaluated the impact of wind turbine facility on elk and the other looked at desert bighorn sheeps' response to the construction of a single water pumping facility which is quite distinct from a 315 MW, 112 turbine wind energy generation facility covering more than 10,000 acres.  BLM contends that based on the lack of data,[11] it was reasonable for it to rely on studies involving other animals.  The Court agrees.

Early on, the Project was adjusted to eliminate 14 wind turbines in response to documented sightings of PBS. (OWF 59596.)  Potential impacts to PBS as a result of the operating wind farm would be minimized through the implementation of Mitigation Measures Wild-1s (Implement a Bighorn Sheep Mitigation and Monitoring Plan), Wild-1hh (Provide annual PBS status reports), Wild-1ii (Participate in coordination

---

[11]The FWS also acknowledged the lack of data and stated that the "lack of data concerning ungulate behavior around wind turbines underscores the importance of monitoring efforts in the project vicinity." (OWEF 182.)

[12cv2211-GPC(PCL)]

effort with BLM for the design and construction of a wildlife overpass across I-8), and Wild- 2e (Collect data on PBS movements during the first 3 years of operation). (OWEF 1602.)  In addition, a Habitat Restoration Plan was designed to restore the Carrizo Marsh, a historically important resource for the PBS.  (OWEF 2767-2807.)

Accordingly, the Court concludes that the BLM did not act arbitrarily, capriciously or abuse its discretion in its analysis of the PBS in the FEIS.  See 5 U.S.C. § 706(2)(A).

### 4.    Environmental Justice

Plaintiffs argue that the BLM violated Executive Order 12898 by failing to address the disproportionate impacts of the Project on the region's Native Americans, many of whose sacred cultural and religious sites lie within or adjacent to the Project site.  They contend that the analysis was limited to communities found within one-half mile of the proposed Project site and improperly excludes environmental justice impacts of the Project on most of the region's Native Americans.  (OWEF 971.)

BLM argues that Plaintiffs cannot raise an environmental justice because they raise the claim on behalf of unspecified Native Americans who are not parties.  Second, Plaintiffs lack standing as they have not alleged any injury in fact.  Ocotillo contends that the FEIS conducted an analysis of potential effects on minority and low-income populations in full compliance with Executive Order 12898 and concluded that the minority population would not be disproportionately affected by the Project.  (OWEF 1259-60.)

Executive Order 12898 requires federal agencies to analyze the effects of proposed projects on minority communities.  59 Fed. Reg. 7629 (Feb. 16, 1994).

> To the greatest extent practicable and permitted by law, and consistent with the principles set forth in the report on the National Performance Review, each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States

59 Fed. Reg. 7629 (Feb. 16, 1994).

The Executive Order also states that,

> This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it create any right, benefit, or trust responsibility, substantive or procedural,  enforceable at law or equity by a party against the United States, its agencies, its officers, or any person. This order shall not be construed to create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order.

Id. at 7632-33.

The Executive Order provides that there shall be no right to judicial review as to compliance of this Order.  In Morongo, the plaintiff alleged that the FAA violated NEPA and Executive Order No. 12898.  Morongo Bank of Mission Indians v. FAA, 161 F.3d 569, 575 (9th Cir. 1988).  The Ninth Circuit noted that Executive Order 12898 does not create a right to judicial review for alleged noncompliance and did not address that issue in its decision.  Id. (APA case with an Environmental Assessment ("EA")); see also Sur Contra La Contaminacion, 202 F.3d 443, 449–450 (1st Cir. 2000); Air Trans. Ass'n of Am. v. FAA, 169 F.3d 1, 8–9 (D.C. Cir.1999); ACORN v. U.S. Army Corps of Engineers, No. Civ. A00-108, 2000 WL 433332, at *8 (E.D. La., Apr. 20, 2000) (EIS and NEPA); Bullwinkel v. U.S. Dept. of Energy, 11cv1082-JDB-egb, 2013 WL 4774766, at *5 (W.D. Tenn. Sept. 4, 2013) (claim relying directly or indirectly on Executive Order 12,898 dismissed under Rule 12(b)(1) as nonjusticiable).

However, another circuit has held that when an agency includes an environmental justice analysis of the effects on minority and low-income populations in its EIS, then the environmental justice analysis can be reviewed under NEPA and the APA. Cmtys. Against Runway Expansion, Inc. v. FAA, 355 F.3d 678, 689 (D.C. Cir. 2004) (concluding that environmental justice claim "is properly before this court because it arises under NEPA and the APA, rather than [Executive Order 12898]" and the agency "exercised its discretion to include the environmental justice analysis in its NEPA evaluation."); see also Allen v. Nat'l Inst. of Health, --- F. Supp. 2d----, 2013 WL 5434817, at *25 (D. Mass. Sept. 30, 2013).

It does not appear the Ninth Circuit allows a cause of action under Executive

Order 12898 even if brought under the APA. However, even if judicial review of Executive Order 12898 were available under NEPA and the APA, the Court finds that the BLM reasonably concluded that the minority population and low income populations would not be disproportionately affected by the Project. (OWEF 1259-60.) "The purpose of an environmental justice analysis is to determine whether a project will have a disproportionately adverse effect on minority and low income populations." Mid States Coal. for Progress v. Surface Transp. Bd., 345 F.3d 520, 541 (8th Cir. 2003).   In Cmtys. against Runway Expansion, Inc., the plaintiff argued that the environmental justice analysis was arbitrary and capricious because the FAA's choice of a narrow geographic comparison population was unreasonable.  355 F.3d  at 688.  The plaintiff argued that the FAA should have analyzed noise impacts on minority populations based on a wider geographic region from the airport.  Id.  The court held that the FAA's choice to limit the geographic region was reasonable because significant nosie impacts are limited to the vicinity of the airport,  Id. at 689.

Here, the BLM utilized an affected area of one-half mile from the proposed Project site, because "using an affected area of one-half mile for environmental justice impacts, rather than 1 or 2 miles, identifies localized impacts of the project." (OWEF 971.) It explained that looking at a wider area would not identify any disproportionate impacts to minority and low-income populations caused by the Project. (OWEF 971.) The BLM's decision to limit its analysis to one-half mile of the Project was reasonable and is entitled to deference.  See Cmty's Against Runway Expansion, Inc., 355 F.3d at 689.  Based on this geographic area, BLM properly concluded that the minority population and low income populations would not be disproportionately affected by the Project. (OWEF 971-73; 1259-60.)  Accordingly, the BLM reasonably analyzed the environmental justice impacts.

## C.    Mitigation Measures

Plaintiffs conclusorily maintain that the FEIS improperly deferred formulation and analysis of seventeen listed key mitigation plans until after completion of

environmental review.  They also assert that the FEIS violates NEPA by disguising analysis of the geologic hazards on the Project site as mitigation and deferring it until after approval. (OWEF 1376.)  Federal Defendants argue that Plaintiffs' legal analysis is incorrect and while listing numerous mitigation plans, only specifically addresses the geotechnical analysis which was properly addressed.[12]  Ocotillo contends that out of the twenty-four (24) mitigation plans, 21 (twenty-one) were prepared before the date of the ROD while the other three were finalized within a week and later in 2012. (Dkt. No. 39, Appx. 1.)  Moreover, Defendants argue there is no requirement that mitigation plans be finalized prior to execution of the ROD.

The United States Supreme Court has distinguished "between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 352 (1989).  An EIS must include a reasonably complete discussion of possible mitigation measures to minimize environmental consequences. Laguna Greenbelt, Inc. v. U.S. Dept. of Transp., 42 F.3d 517, 528 (9th Cir. 1994) (citing Robertson, 490 U.S. at 352-53.)  There is no substantive result based standard to mitigate adverse environmental effects.  NEPA only requires that mitigation is discussed in sufficient detail to ensure that environmental consequences are fairly analyzed. Id.  Mitigation "need not be legally enforceable, funded, or even in final form to comply with NEPA's procedural requirements." NPCA v. U.S. Dept. of Transp., 222 F.3d 677, 681 n. 4 (9th Cir. 2000).

In their opposition to Federal Defendants' motion for summary judgment and their reply, Plaintiffs argue that the EIS merely lists mitigation plans and completely defers formulation and analysis of those plans until later and specifically cites to the

---

[12]Federal Defendants argue that many geotechnical studies were submitted prior to the ROD. (OWEF 606; 31161-66; 34067-167.) While Plaintiffs raise the geologic mitigation plan in their moving papers, they fail to address, in their reply, Federal Defendants' opposition demonstrating studies of this issue prior to the ROD.

following mitigation plans: OWEF 1252: Management Plan for Archaeological Monitoring; OWEF1340: Construction Waste Management Plan; OWEF 1502: Screening Plan; and OWEF 1544: Spill Prevention Containment and Countermeasure Plan.

In response, Federal Defendants provide specific citations to the record concerning detailed mitigation plans for these issues. A Spill Prevention Control, and Countermeasure Plan and a Wind Farm Spill Response Plan were prepared on September 29, 2011. (OWEF 31261-92; 36415-80.) A Construction Emergency Response Plan was developed in September 2011. (OWEF 31435-43.) A Management Plan for Archaeological Monitoring, Post-Review Discovery and Unanticipated Effects was prepared in April 2012. (OWEF 25533-65; 290-314.) Ocotillo also documents that a Screening Plan was developed on September 21, 2012 and a Construction Waste Management Plan was created on April 30, 2013. (Dkt. No. 39 at 17.)

Plaintiffs merely list mitigation plans that they allege were formulated after completion of environmental review. However, Defendants demonstrate that most of the mitigation measures were formulated prior to the ROD. But even if they were not formulated until after the ROD, there is no requirement that mitigation plans be finalized prior to execution of the ROD. See NPCA, 222 F.3d at 681 n. 4. Moreover, as the BLM points out, the Project's Environmental and Construction Compliance Monitoring Plan ("ECCMP") requires verification of the implementation of and compliance with mitigation measures. (OWEF 127; 377-416.) Accordingly, Plaintiffs have not demonstrated that the BLM violated NEPA by improperly deferring analysis of all mitigation measures.

**D.     Federal Land Policy Management Act ("FLPMA")**

Plaintiffs argue that the Project violates the CDCA Plan because the Project conflicts with the Multiple Use Class ("MUC") Class L designation. They also contend that while the appendices addressing visual resources in the FEIS addresses the Project area as a visual resource management ("VRM") Class II and Class III, the BLM does

[12cv2211-GPC(PCL)]

not explain why the body of the FEIS states that the Project would be managed under an interim VRM Class IV designation.

Plaintiffs recognize that the Court in two prior cases, Desert Protective Council v. U.S. Dept. of Interior, 927 F. Supp. 2d 949 (S.D. Cal. 2013); and Quechan Tribe of the Fort Yuma Indian Reserv. v. U.S. Dept. of the Interior, 927 F. Supp. 2d 921 (S.D. Cal. 2013), the Court ruled that the BLM did not violate the CDCA Plan and FLPMA by approving the Project as it complies with the Class L designation and that the BLM's decision to designate the Project a VRM Class IV was not arbitrary, capricious or an abuse of discretion.  The parties acknowledge that those claims are similar to the ones raised in this case and Plaintiffs repeat these arguments in order to preserve their claims on appeal.  Accordingly, based on the Court's reasoning in Desert Protective Council v. U.S. Dept. of Interior, 927 F. Supp. 2d 949 (S.D. Cal. 2013); and Quechan Tribe of the Fort Yuma Indian Reserv. v. U.S. Dept. of the Interior, 927 F. Supp. 2d 921 (S.D. Cal. 2013) addressing Plaintiffs' argument on the alleged FLPMA violations, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Defendants' motions for summary judgment on the FLMPMA cause of action.

**E.    Migratory Bird Treaty Act**

Plaintiffs contend that the BLM and Ocotillo have failed to obtains permits as required under the Migratory Bird Treaty Act ("MBTA") for killing migratory birds since the Project is likely to kill many migratory birds during the construction and operation phases.  Federal Defendants argue that the BLM has no duty, acting as a regulatory agency, to obtain a take permit under the MBTA before authorizing a third party's proposed project.  They contend that the MBTA provides for an intentional take permit, not an unintentional taking of migratory birds.  Ocotillo asserts that it relied on the FWS, the agency in charge of implementing the MBTA, to comply with MBTA.  Pursuant to FWS' direction, Ocotillo developed the Avian and Bat Protection Plan ("ABPP") and obtained concurrence from the FWS.  (OWEF 722.)

The MBTA directs that unless otherwise permitted "it shall be unlawful at any

time, by any means or in any manner, to pursue, hunt, take, capture [or] kill . . . any migratory bird . . . nest, or egg of any such bird . . ." unless permitted by the Interior Secretary. 16 U.S.C. § 703(a). "Take means to pursue, hunt, shoot, wound, kill, trap, capture, or collect." 50 C.F.R. § 10.12. The MBTA is a criminal statute enforced by the FWS. See 16 U.S.C. §§ 706, 707(a), (d). It creates no private right of action. However, Plaintiffs may bring a cause of action under the APA for violations of the MBTA. City of Sausalito v. O'Neill, 386 F.3d 1186, 1203-04 (9th Cir. 2004).

Plaintiffs cite the Glickman case in support of their position that the BLM should have obtained a permit. See Humane Society v. Glickman, 217 F.3d 882 (D.C. Cir. 2000). Glickman involved the Department of Agriculture's implementation of its management plan for Canada geese requiring the agency to kill or take migratory birds. Id. The D.C. Circuit held that its taking of migratory birds without a permit violated the MBTA. Id. Glickman involved a federal agency seeking action that would intentionally kill and capture Canada geese. Id. In this case, the Project does not involve the intentional killing of birds by the BLM but involves the construction of a wind energy-generating facility.

Courts have held that the MBTA was intended to prohibit conduct directed towards birds and did not intend to criminalize acts or omission that are not directed but which incidentally cause bird deaths. U.S. v. Brigham Oil and Gas, LP, 840 F. Supp. 2d 1202, (D.N.D. 2012) (habitat destruction caused by oil and gas companies' use of reserve pits, leading indirectly to bird deaths, did not amount to a "taking" under the MBTA). In interpreting the word "take" in the MBTA, the Ninth Circuit stated that the definition of "take" in the MBTA was limited to conduct engaged in by hunters and poachers. Seattle Audubon Soc'y v. Evans, 952 F.2d 297, 303 (9th Cir. 1992) (logging in northern spotted owl habitat causing harm to birds did not violate MBTA). "While acknowledging that some courts have held that the Migratory Bird Treaty Act reaches direct, though unintended, bird poisoning from toxic substances, the appellate court ruled that habitat destruction, leading indirectly to bird deaths, does not amount to a

[12cv2211-GPC(PCL)]

'taking' of a migratory bird within the meaning of the Migratory Bird Treaty Act." Brigham Oil and Gas, LP, 840 F. Supp. 2d at 1210 (citing Seattle Audubon Soc'y, 952 F.2d at 303).  Moreover, the FWS acknowledged that the MBTA has no provision concerning "incidental" takings. (POSTROD 11562.) FWS recognized that some birds may be killed at renewable energy developments despite all reasonable mitigation measures and its mission is to investigate, enforce and seek to eliminate their impacts on migratory birds.  (Id.)  One way to mitigate is through the creation of an ABPP to reduce risks that result from bird interactions with a wind energy facility.  (Id.)

In this case, the Project's purpose and goal is not to intentionally kill or take birds but is to provide an alternative source of energy.  Although not required to obtain a permit, the BLM analyzed numerous pre-site-selection monitoring data and bird/nest surveys that allowed the BLM to choose a project site with minimal risks to migratory birds. (OWER 2934-69.)  Also, an ABPP was developed to implement numerous protective measures for the birds. (OWEF 2922-3008.)  The ABPP provides detailed information about mitigation during each phase of the Project including pre-construction, construction and operation phase of the project.  (OWEF 2970-72.) Furthermore, the ABPP discusses how post-construction monitoring and adaptive management will avoid, minimize and mitigate impacts to birds.  (OWEF 2972-75.) The process involves a Technical Advisory Committee ("TAC") which will monitor OWEF activities, including mortality rate, to determine the need for project mitigation. (OWEF 2972.) The ABPP satisfied the elements recommended in the FWS Guidelines. (POSTROD 11567–78.) BLM thoroughly analyzed the Project's potential impacts on migratory birds, developed numerous measures to avoid and minimize those risks and imposed enforceable monitoring requirements on the Applicant.

Plaintiffs have failed to demonstrate that a permit is required under the MBTA for an unintentional killing of migratory birds.  Accordingly, the BLM's decision to issue the ROW without obtaining a permit was not "arbitrary, capricious" or without observance of procedure required by law.  See 5 U.S.C. § 706(2)(A) and (D).

[12cv2211-GPC(PCL)]

**Conclusion**

Based on the above, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Federal Defendants and Ocotillo Defendant's motions for summary judgment.  The Court **vacates** the hearing date set for November 8, 2013.  The Clerk of Court shall close the case.

IT IS SO ORDERED.


DATED:  November 6, 2013

HON. GONZALO P. CURIEL
United States District Judge

[12cv2211-GPC(PCL)]